This is totally out of the ordinary, but just compared with my colleague, at least to my way of thinking, this outcome is so mind-boggling. Rather than hearing Mr. Sachs argue why it should be reversed, it might help us more to hear Mr. Meyer and Mr. Mayer tell us why it shouldn't be reversed. Because if you can explain to me why this case is not a slam So why don't we start with you, Mr. Your Honor, with all respect, anything that keeps me from arguing after that last student Oh, she's the tough act to follow. I'd be very happy not to sit down. I haven't seen you in a long time, Mr. Sachs. How are you doing? I'm well, thank you. Is it Mr. Meyer or Mayor? It's Meyer. Okay. Jeffrey Meyer for the Attorney General. May it please the Court. It just seems to me from top to bottom, this thing, it seemed like the Court was just having a real bad day. One, and the IJ was having a bad day and the BIA was having a bad day. It was like every time Mr. Totemeyer got to court, it was under a full moon almost. You've got the refusal to accept the attorney saying that the concession, to the extent it was a concession, was erroneous. I don't understand that, especially since the real information is in possession of the government in terms of his admission date. Finding that his adjustment of status was an admission with the statute could hardly be much clearer as to what constitutes an admission. Finding that his failure to change the address in Minnesota was a crime of moral turpitude, given what the Minnesota Supreme Court has said in Larson, what we said in Maboud constitutes a crime of moral constitution. It was like every conceivable turn, folks got it wrong, it seems like. Now, why isn't that, why am I wrong in looking at the case that way? Well, Your Honor, first of all, the Board applied a binding precedent. What precedent did they apply, and to what question? Well, they were bound by Lobartovo. Well, let's talk about the admission date. How can you argue that the admission date is anything but 1980? It comes in as a B-1 visitor, and then that's changed shortly thereafter to a F-1, as a student. Well, the facts, those facts are not, have not been found by the agency, because those were presented in a motion to reopen that was, that the Board declined to. You're contesting that? You're contesting the date of his change of status? Well, I'm saying it's not in the record. Didn't you at one point argue that the date of change of status was the date of admission? And now you're saying it's not in the record? No, we are arguing that the change in status was the date of admission. But now you're saying it's not in the record. I mean, the only argument I can think of. That's in the record. I'm sorry. The only argument I can think of for you is that if you have the BIA saying that, look, if you're entering illegally and then you get adjusted later on, that's the date. But if you enter legally, then you don't get, the date of adjustment isn't anything magic. The only argument I can think of for you is that he ceased being a student on, I guess, September 8th or so of 82, and somehow there's a break in the action. But nonetheless, he was still here legally at that time. So is that your argument? Because I didn't see it being made. Well, actually, that is the argument because, first of all, the procedural context here, we had a removal, and then that was appealed. And then in the meantime, we had a motion to reopen that came before the board, alleging this new admission date. But in the meantime, we had a board precedent come down, which was a matter of, I apologize if I butcher this name, but it's Alyazji. You're right. Yeah. And they addressed at length the issue of what's an admission date for purposes of 237. Right. And when they did that, they modified their prior precedent. Saying the five-year clock is not reset by a new admission from within the United States through adjustments of status. And I'm reading. If you hear legally adjustments of status, don't be irrelevant. Well, he was no longer legally present. And that's why we're. But read the statute. On what terms admission or admitted mean with respect to an alien, the lawful entry of the alien in the United States after inspection and authorization by an immigration officer. When you change your status, there's no inspection by an immigration officer. This is what the court said. That's simply a change of your legal status. It has nothing to do with your physical entry in the United States. But the board was clear in addressing that point in a matter of Eljan El-Yazji. The board was clear in everything it did here. And it seems to me everything it did here was dead wrong. It does boggle the mind. Well, they pointed out that that definition of admission is different in different contexts. And they gave numerous examples of why it has to be there. But you're saying when he ceases his course load. He fell out of status. Yeah. He fell out of status. And that, therefore, nullifies the fact that he had a date of admission of 1980? Yeah. He was no longer present at that time. What law and regulation says that admission is determined by a date that you become legal after you fall out of status? Or does any case even say that? Well, there's a couple circuits. Because El-Yazji doesn't go that far. It says it isn't reset by a new admission from within the United States. And that would have meant if he had a new admission. I mean, that really does address this. Because after he fell out of status, it'd have to be a new admission. And it says it isn't reset by a new admission. I just can't reconcile the two. Well, we relied on the footnote 9 that talked about when there isn't status and that the later admission date where. Which footnote is it? It's in a matter of El-Yazji. Yeah. Which footnote? And that. Which footnote? Footnote 9. Because it's not extending the status, but rather commencing the status, that that's going to be the date of admission that tethers it to the crime. Did you make this argument in front of the BIA? Or did my colleague, Judge Amber, were just going to plant the seeds for you? That's kind of the point that I wanted to make here. Okay. Did you make this argument in front of the BIA? Neither party did, and here's the reason why. Let's try it one more time. Did you make this argument? They wouldn't make the argument because the argument undermines their position. Did you make this argument in front of the BIA? No, Your Honor. Okay. And can I tell you why? Absolutely. I'm dying to find out. Well, matter of Elianzi comes down right before the motion to reopen is decided. So there's no attack on matter of Elianzi. And it's not even briefed in the supplemental brief. This is new precedent. The Board applies it. There's no attack on matter of Elianzi. What they're saying is it's wrongly applied. And we're asking for deference on the Board's interpretation there. So you're, in effect, asking us to be the first to say that once you are no longer a student, and you need some other act, i.e., an adjustment, in order to start the clock running again for date of admission? Well, for 237 purposes. But footnote 9 talks about he would enter without inspection. Yeah, footnote 9 doesn't even apply. It doesn't address out-of-status. The situation would have been different had the respondent adjusted status in 2006 after entering the United States without inspection. It didn't happen here. Well, it's the language there about not. It says in that case. The date of adjustment would have triggered the running because it would have commenced. That makes sense. It doesn't say out-of-status. Okay, well, we're arguing. Let's go to the second issue, the moral interpretation. Failing to register? Well, for three years, I guess, he did register in Minnesota, but then he did not after that. Is that correct? Yeah. And so you're saying that in light of the Tobar case from 2007, that's a crime of moral interpretation. But it looks like there's at least three circuits and four cases and three circuits that say, boy, that doesn't make a whole lot of sense. That's the Ninth Circuit principally. And I'm just not seeing. Has any circuit really said we support what was done in Tobar? Directly, Your Honor, no. What about indirectly? No, I was indirectly issuing a question. But at the very least, Tobar LOBO represents a departure from prior BIA precedent, which said that regulatory, simple regulatory statutes are not crimes of moral turpitude. So why, you know, and then without explanation, they find this statute not to apply the usual moral turpitude standard, but to say even though it's regulatory, it is a crime of moral turpitude. Yeah, I understand your question. Well, the Board was explicit about saying, yes, normally regulatory crimes don't fall into this category, but this was an exception. And the exception was justified by saying this duty to society is of such a nature that a breach of it would be considered a vile or depraved act. Well, they compare it to espousal and child abuse, which kind of boggles my mind. The failure to register, regardless of the intent the person had when they failed to register, was equivalent to child abuse. That's what they said in Tobar. Yeah. I could just make a few points here. One is that nobody has interpreted this in the context of the Minnesota statute. Well, what needs to be the specific Minnesota statute? The Supreme Court of Minnesota in Larson told us how they interpreted it. We have our own President Mahmoud, I guess it's pronounced, or Mahmoud, saying that it's got to be something that is vile or evidences depravity to rise the level of crime involving moral turpitude. So why should we take what is clearly a regulatory statute, and even absent a finding of fraudulent intent, because that's not here, knowing is here. And the BIA simply took the concept of knowing and said, well, the statute requires a knowing failure to fraud. Every time I speak, are there any buttons back there? Is this like the Bud Light commercial where they pour the liquid on the bar and they cause it to go into overtime? They say that they equate knowing failure with a willful violation. Then they take willful and say, ah, it's willful. Therefore, it's moral turpitude. It's kind of 2 plus 2 equals 10 to the minus 9. You follow what I'm trying to say? I don't understand that reason at all. I think they're saying that they're combining intent with... With moral turpitude. They're taking the concept of knowing violation, finding, well, if it's knowing, then it's willful. If it's willful, that's enough to establish moral turpitude. Yeah, because they're saying it's inherently base or vile. And help me with that. How is the failure to register a change of address, especially after consistently registering? And he went to his probation officer. It wasn't that he was hiding. He goes to the PO, shows himself there. After he didn't register, he moved to help out his ill sister and mother. But you couldn't have enlarged him. You couldn't dream up facts that were worse for you in this case. Well, none of those facts are in the record. I know they're cited in Pallant's brief. The fact that his reason for why he moved is not in the record? Right. And we don't look at that under a categorical approach. And I think that point is consistent. But what makes it vile and depraved? How is it different from any other kind of failing to register in terms of, you know, the mindset and the conduct of the person? You know, I failed to register. I should register for, you know, something and I failed and I should do it as a matter of law. Well, the board says it's because of the serious risk these offenders pose to society that a violation of that duty would, therefore, be inherently vile or depraved. But don't we have to look at the act itself and what the person does? I mean, that's the conduct and what it punishes is the failure to register. We can't look at the ultimate implications of non-registration, can we? Well, the board says we can't. I know, but that's why they put us here and they pay us these big bucks. What the board does to make sure the board is at least arguably doing something which is consistent with the law. Speak for yourself about the big bucks. I would point out, though, that there is a federal registry requirement and a violation of that is in itself a grounds for removal. I mean, this is not the federal statute. We can understand that. If the statute allows it, then the statute allows it. Here the statute requires something else. I mean, we really want somebody to do it and if they don't, we'll throw them out of the country. That's one thing, but to say it is vile and depraved is something else. But my point was that it rises to that level. Yeah, it's serious. You believe that we, as a society, believe it's serious. I have nothing further unless there's more questions. No. Okay. Thank you. Mr. Sachs, anything you want to say? You're probably prepared if you want to stand up and say something and run the risk of losing. Well, let me ask. You don't think it's for me to just sit there and be quiet? No, I want to ask you a question about moral turpitude. I mean, we do defer to the Board's view when it comes to moral turpitude. Well, yes and no. Well, we do, but when do we draw that line? Would we be substituting our own view? And is it our role to do that? Well, not according to what you said, Judge Brendel, if I may respectfully. We defer to their definition. We defer to their finding, if it's a reasonable finding, but we don't defer to – you don't defer to whether a statute meets that test. But there's a line of is it reasonable or is it unreasonable. Right, and one of the reasonableness tests is whether it's a break with their own jurisprudential and analytical history for the last hundred years, as you laid out in the genre. Well, that, I think, is a problem. And that is not – that's one of the problems, and it gives lip service. And, by the way, this is one Board member who wrote Tobar-Lobo, who also wrote the Board's decision in Plasencia-Ayala, who also wrote the decision in Respondent George Totome's case. It's one Board member who gave lip service to the idea that he was applying the law by just ascribing to this conduct this reprehensible nature because it offended social mores. And the vigorous dissent of another Board member in the Tobar-Lobo case, which was adopted full force by Plasencia-Ayala court, said that every crime basically is contrary to society. So I say that you have said, this court has said, in NAPIC and in other cases, and even cases after NAPIC, that there's deference when deference is due, but not when there's an unreasonable interpretation of the statute. And one of the grounds, one of the tests for reasonableness, is internal consistency with the Board's own jurisprudence. If I could just clarify on the Alyagi admission point just for a moment, because coincidentally Mr. Alyagi was also my client. So Alyagi was percolating up through the system at the same time that this case was also going through the system. And what happened in Alyagi, and the footnote to look at, to clear this up just for once and for all, is not nine, it's eight. Because in footnote eight, the Alyagi court addresses this precise situation who somewhat enters lawfully, just like Mr. Alyagi did, just like Mr. Totome did, but thereafter falls out of status. And the Alyagi court says, while you could read this other Ninth Circuit case, to say that you have to be in status at the time of adjustment in order to have the clock start at the initial admission. And say no overstay or violation would have no effect on our name. Precisely. And that's what the other circuits said, Zhang, Aramu, and the other cases that were percolating up in the circuits before the Board itself issued Alyagi. And if there was ever any doubt about that, if you look at page seven of our opening brief, we cite to the, not the government, but I guess it's the government's client, that is to say DHS's own brief, as we were briefing Alyagi before the Board, conceded the point. And we cite to their brief, to the DHS appellate litigation brief, on page seven of our opening brief, and they conceded the point that my colleague now is now disputing. And that is to say that they were very clear, they were very clear that a falling out of status after a lawful admission does not restart the clock when an adjustment starts. And, in fact, it's the notion, just as Judge Ambrose said, that a clock would start as adjustment, with an adjustment, is reserved for an EWE, an entry without inspection, who has never been accorded lawful status.  consistent with 101A13 of the Act. They have to give them status at some point, so it starts on the EWE, for the EWE person, or for the paroled person, someone who hasn't made an entry with inspection previously at the point of adjustment. But Mr. Alyagi's case is indistinguishable from Mr. Totome's case. And, frankly, it's unfortunate, and I was shocked, frankly, that the government, that is to say both ICE, DHS, and the government in oil, didn't just agree that the record needed to be supplemented with evidence that was in their own possession. To Judge McKee's point about whether the factual recitation of my client's circumstance for his reason to failure to notify his parole officer about his change of address, that is in the certified administrative record at page 98. It was an affidavit that my client prepared in 2007 before there was any litigation, because he had lost his green card and he was trying to get a new one. And he laid out his entire situation as to when he came here, why he failed to appear after the SORA was applied to him. And the point is the government had this in their possession. I don't want to say any particular lawyer had it in their possession, but it was in the A file. Now, while all this was percolating, both of these cases, Dent v. Holder came down, the Ninth Circuit case, which said that a respondent in immigration proceedings shouldn't have to jump through the FOIA hoop to get evidence that the government has in their own A file to try and defend themselves against a removal case. Where is that in the administrative record again? Well, his affidavit is at page 98 of the certified administrative record. The entire first portion of the administrative record is evidence that we put before the board in an attempt to ask them to supplement the record so that regardless of how al-Yaji was decided at that time, if we needed to, the full record would be before this court. So we had to file a separate petition for review, etc., etc., just to get that here. But Dent v. Holder speaks to this, which is really a due process issue as to withholding information that's within the A file. In this case, the same officer that took my client's initial statement upon his arrest, the same agent in 2009, had information that he had been previously admitted in 1980, and we had to go through a FOIA to get that. So that's the al-Yaji issue in a nutshell. Okay. Are you anything else? No. Mr. Meyer, do you want to respond to this footnote 8? I've got to tell you, this is really troubling to me. The whole FOIA thing I was incredibly perplexed by. If this were a criminal case, Brady would apply and he'd clearly be responsible for turning over information, even if he didn't know it was there. To make them go through a FOIA request, to prove something that can only be proven by your own documents in terms of when he came in, you argued to us footnote 9 when you were presenting to us initially. Footnote 8 is smack dab this case, which you didn't bother to call to our attention. Footnote 9 doesn't even apply to this case. Well, I read footnote 8 to say that, you know, the Board's trying to clean up some of the dicta in that Ninth Circuit case. But we now make clear that an overstay or violation would have no effect, that's italicized, on our analysis under this particular section of the Act. I thought they were saying no effect as to the analysis of 237. No effect on our analysis under Section 237A2AY of the Act. Analysis is once you're lawfully admitted, an adjustment is irrelevant for purposes of date of admission. I found it very unclear. If you found that unclear... If that's the interpretation, I think that forecloses our argument. I mean, however, it can also be read to imply that a different rule might be appropriate if an alien had overstayed or otherwise violated his nonimmigrant status before adjusting. We now make clear that an overstay or violation would have no effect... It's italicized. ...on our analysis. It's a lot clearer than footnote 9, which you seem to have no problem understanding, even though it's totally irrelevant. I thought the footnote concerned their analysis in the body of the document. As I said, it concerns their analysis under the statute that they decided. The other thing that really bothered me while you're there is you're initially arguing that the date of his admission in 1980 was not in the... Even though you relied upon that in arguing to the BAA that that was the date of admission. Unless I misunderstood and I can get the transcript. Well, we had to show that why the board thought that that date was not relevant. Well, didn't you argue initially today that the 1983 date was not in the record? No, that's in the record. Maybe you misunderstood. Okay. I thought you were saying the date of the adjustment of status was not in the record. One other thing on the FOIA request. Why in the world? I mean, look, we're just trying to get, sort out facts, and it's a justice system. It's supposed to be. They want to know what it is. Can you give us the information that confirms that this person came here in 1980? And obviously they must have hit a roadblock at some point because they had to file a FOIA request. That's just not loyal. Yeah, I don't know the details of the discovery issues below because they simply weren't raised or briefed. And I don't know if they attempted discovery and they felt it was noncompliant or if there's no discovery and then later they said, we wish we would have done it. I don't know why there's a complaint there.  They presented them to the board. I thought there came a point at which time the government was asked for documents that would show up at the date of admission that weren't forthcoming or maybe they were specifically told, go pound, sand, file a FOIA request. They filed the FOIA request. And then they were waiting for that request to be complied with by the time the hearing went forward. To me, it looked like that was all on the record. And I argue with Judge Ambrose, it gets really ridiculous. Unless people are just worried about getting their numbers up and if you deport somebody who's a citizen, well, in a way that's kind of bad, but in a way that's kind of good because it counts toward your quota. Unless that's the scenario, this doesn't make any sense to me. Now, maybe that's what's going on here. It ties in with the collateral arrest argument in the other case, which is, I guess, not even there. But to require someone to prove when they came in, when you're the ones that hold that record, it's frustrating. Well, under the precedent at the time, Sununu, the relevant date was going to be the 83rd. Well, don't go back there, Mr. Mudd. Don't go back and try to plow that ground again. That argument on me hearing is as ridiculous as it was when you first made it because the statute is absolutely clear about how they define what an admission is. Well, they have a board precedent. Pardon me? The board precedent was Sununu. Well, the board precedent was as wrong as you are in making the argument today. Both of them are off the wall, frankly. But regardless, I mean, that's what— Regardless? No. I'm saying when they allegedly notice to appear the admission date, they're saying it's that 83 date that makes it removable. So, you know, the other dates I don't think they were concerned about because the board precedent would say, yeah, that's a good date. Okay. What would it be without board precedent? Let me take a brief break before we hear our last case.